UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:08CR240 CEJ |
| | ) | |
| STEVEN RUSSELL ROLLINS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the Defendant's motion to suppress evidence and the motion to suppress statements on June 27, 2008, and a transcript of the hearing was prepared and filed with the Court on July 7, 2008. Based upon the evidence adduced at the hearing as well as a review of the transcript of the proceedings, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Ronald Martin is a detective with the Metropolitan St. Louis Police Department. On April 8, 2008, he applied to a judge of the Circuit Court of the City of St. Louis requesting a warrant to search the premises at 4500 St. Louis Avenue, lst Floor, and to seize illegal drugs, firearms, and cash from the residence. The affidavit in support of the search warrant stated in pertinent part as follows:

On April 4, 2008, Det. Martin had a conversation with a confidential source who had provided information in the past to Martin, and this information had proved reliable and led to the arrest and prosecution in state and federal court of three individuals. The confidential source told

Martin that the source is familiar with Steven Rollins, who the source said resides at 4500 St. Louis Avenue, lst Floor. The source said that in the previous three weeks, the source had been inside the above premises and personally observed Rollins selling heroin and marijuana to other individuals from inside the apartment. The source also told Martin that the source was personally aware that the Defendant kept a handgun and a shotgun stored in the apartment, and that Rollins also told the confidential source that Rollins is armed with a handgun because he is afraid that he will be robbed during drug transactions. After receiving this information, Martin and other detectives conducted a physical surveillance on the premises at 4500 St. Louis Avenue. They conducted these surveillances on April 4, 5, 6, and 7, 2008, and they observed on those dates an unusual amount of foot and automobile traffic coming to the apartment with individuals then going to the front or back door, being allowed in the apartment for a brief period of time, and then leaving the apartment. Specifically, on April 7, 2008, at about 6:00 p.m., they observed a man at the back door conduct a hand-to-hand transaction with someone inside the apartment. They observed this person place whatever he was given by the person inside the apartment inside his waistband and walk away from the premises. Eventually, this person was stopped by police officers and searched. After the search, the officers recovered four capsules of what appeared to be heroin from the man's waistband. This person was arrested and booked.

On April 8, 2008, Martin again talked to the confidential informant, who told Martin that within the last twelve hours, he had been inside the apartment and observed the Defendant to be in possession of heroin in the apartment. The confidential informant also said that he had observed a handgun in the apartment at this time. Martin also checked the Defendant's police record through the department computer, and determined that the Defendant had three outstanding arrest warrants

and was a multiple-time convicted felon. Based on the above affidavit, the judge issued a warrant to search 4500 St. Louis Avenue, lst Floor, and to seize firearms, cash, and narcotics.

On April 9, 2008, Det. Martin met with members of the Mobile Reserve Unit of the Metropolitan St. Louis Police Department. This unit is tasked with executing what are determined to be high risk search warrants. Martin briefed the Mobile Reserve officers on his investigation and told them that the warrant would be a high risk entry kind because the Defendant sold drugs from the apartment and was armed with a loaded firearm during drug transactions for fear of robbery. In addition, the affidavit stated that there were other weapons on the premises as well as heroin.

After the briefing, members of the Mobile Reserve and Det. Martin and his partner proceeded to 4500 St. Louis Avenue. After arriving, the officers went to the door of the apartment, and one of the Mobile Reserve officers knocked on the door, announced that police officers were at the door, and had a warrant to search. The officers waited approximately fifteen to twenty seconds, and when no one answered the door, the door was breached with the battering ram. After the door was breached, Officer Donnell Walters of the Mobile Reserve team entered the premises, and immediately observed an individual, who was later identified as the Defendant, sitting on a couch right next to the door of the front room of the apartment. As soon as Walters made entry, the Defendant stood up, raised his hands, and stated, "Don't shoot. I've got a gun." At that point, Walters observed a handgun sitting on the couch on a cushion right next to where the Defendant was standing. Walters went immediately to the gun, seized it, and passed it out the front door to Det. Martin who was standing on the front porch. The apartment was very small, and when the door was breached, the door actually touched the couch on which the Defendant was sitting.

3

After receiving the weapon from Walters, Martin rendered the handgun safe by unloading the weapon. Martin then placed the Defendant under arrest for the three outstanding warrants, and for being a felon in possession of firearms. Martin then advised the Defendant of his complete <u>Miranda</u> rights from a police department form, and asked the Defendant if he understood his rights. The Defendant stated he understood his rights, and in response to a question about the weapon, stated that he had the gun in his possession because he is worried about people trying to rob him. He also told Martin, "You got me good." Although the Defendant was placed in flex handcuffs during this period of time, Martin described the Defendant's attitude as "very cooperative," and he was not threatened or promised anything in any way to obtain any statements made by him. Martin stated that the Defendant was coherent and rational. At this time, the Defendant told Martin that he knew he was in "big trouble," and that there were not a lot of drugs left in the house. He stated he wanted to cooperate with Martin, and asked Martin to book him and release him pending application of warrants. He told Martin that all the "stuff in the house" belonged to him. Again, Martin made no promises nor did he make any agreements with the Defendant in order to obtain these statements. Martin and the other officers then proceeded to search the apartment. The apartment was a small, one bedroom apartment. In the bedroom, the officers recovered a .22 caliber revolver and .25 caliber ammunition. From the living room closet, the officers seized a .12 gauge shotgun and a blue lunch bag containing a quantity of heroin. Also from the hall closet, the officers retrieved two blenders, eleven syringes, a bottle of dormin agent used for cutting heroin, and numerous rounds of various calibers of ammunition. From the living room in a heart-shaped bowl on an end table, the agents seized yellow capsules which they believed to contain heroin. As stated above, also seized from the

Defendant was the .40 caliber semi-automatic pistol seized from the couch next to the Defendant, which pistol was loaded with five live rounds and one round in the chamber.

After the search was completed, Martin informed the Defendant that he was also going to be booked for possession of drug paraphernalia, possession of narcotics and the additional weapons. At this point in time, the Defendant told Martin that he had stopped selling heroin approximately two weeks prior to the search warrant being executed because he suspected the police department was on to him. He said that the heroin found in the apartment was just for his own use. He also stated that he would always have a gun with him whenever he was out of jail. Again, the Defendant was not promised anything or threatened in any way for making these statements, and he remained cooperative throughout the search.

## Conclusions of Law

A. The Warrant to Search 4500 St. Louis Avenue

Based on the above findings, the undersigned concludes there was probable cause for the issuance of the warrant to search 4500 St. Louis Avenue, lst Floor. For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet the probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context--not readily or even usefully reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, at 232. Probable cause may be based on the totality of the circumstances present. All that need be shown for probable cause to arrest is that a "fair probability" exists that a crime has been committed, and that the defendant committed the crime. In order to show probable cause for the issuance of a search warrant, all that must be shown is that a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. See Illinois v. Gates, supra. It is also clear that information from a reliable informant, without more, may provide probable cause for the issuance of a search warrant. See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1992). In addition, even an anonymous tip from a crime stopper's hotline or a tip from an informant whose reliability has not been proven is sufficient information upon which to create probable cause as long as the information is corroborated. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

Based on the above, the undersigned concludes there was strong probable cause to search the apartment at 4500 St. Louis Avenue, lst Floor. The affidavit showed that a reliable informant had personally observed the Defendant selling heroin and marijuana from the apartment within three weeks of the search warrant being issued. Physical surveillance by detectives on four consecutive days leading up to the date of the search warrant revealed activity at the house consistent with drug sales and drug dealing. In addition and significantly, one of the individuals suspected of buying drugs from the premises was stopped and searched by police shortly after he was observed to have a hand-

to-hand transaction with a person in the premises, and to place the item obtained from inside the apartment inside of his waistband. The search revealed that the individual had concealed heroin capsules in his waistband, apparently which had been purchased from the person in the apartment during the transaction observed by the officers. In addition to the above, the confidential informant told the officers that within twelve hours of the affidavit being signed, he personally observed heroin and firearms on the premises of the apartment. Further, the officers were aware that the Defendant had been convicted of multiple felonies, and therefore could not lawfully possess a firearm. Based on the above, the undersigned concludes, at the very least, there was a "fair probability" that guns and drugs would be found in the apartment. Therefore, the search was lawful.

  B. The Execution of the Search Warrant

Normally, agents must comply with the "knock-and-announce" provisions, but when certain circumstances exist, the requirements may be shortened or ignored. In Richards v. Wisconsin, 117 S.Ct. 1416 (1997), the Court stated as follows:

> We recognized in Wilson that the knock-and-announce requirement could give way "under circumstances presenting a threat of physical violence," or "where police officers have reason to believe that evidence would likely be destroyed if advance notice were given." 514 U.S., at 936, 115 S.Ct., at 1919. It is indisputable that felony drug investigations may frequently involve both of these circumstances.

Richards v. Wisconsin, 117 S.Ct. 1416, 1420, 1421. In addition, in United States v. Banks, 540 U.S. 31 (2003), the Court stated as follows in holding that officers need not announce their presence in any way when entering pursuant to a search warrant under exigent circumstances:

> In Wilson v. Arkansas, 514 U.S. 927 (1995), we held that the common law knock-and-announce principle is one focus of the reasonableness enquiry; and we subsequently decided that although the standard generally requires the police to announce their intent to search before entering closed premises, the obligation gives way when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile or . . .

would inhibit effective investigation of the crime by, for example, allowing the destruction of evidence," Richards v. Wisconsin, 520 U.S. 385. . . When a warrant applicant gives reasonable grounds to expect futility or to suspect one or another such exigency already exists or will arise upon knocking, a magistrate judge is acting within the Constitution to authorize a "no-knock" entry. And even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in. . .

540 U.S. 31, 36-37. See also United States v. Keene, 915 F.2d 1164 (8th Cir. 1990); United States v. Tracy, 835 F.2d 1267 (8th Cir. 1988). The evidence in this case and the information stated in the affidavit showed that the Defendant always kept a handgun or firearm with him in the apartment because he was worried about being robbed. In addition, the evidence showed that the Defendant was storing large amounts of narcotics on the premises, and that he was selling narcotics from the premises. Given the above two circumstances, it was reasonable for the officers to conclude that the Defendant would be armed in the apartment, and that upon knocking and announcing, the Defendant would have either attempted to destroy the narcotics or would have created a situation that was dangerous to the officers when entering. Therefore, the undersigned concludes that it was objectively reasonable under the circumstances for the officers to wait fifteen to twenty seconds after announcing their presence before forcing entry. In addition, the evidence in the case showed that the Defendant was seated on a couch right next to the door, and that fifteen seconds was more than ample time for the Defendant to come to the door which he apparently declined to do. Therefore, the undersigned concludes that the warrant was executed in a lawful manner. In addition, the undersigned concludes that there was ample probable cause to arrest the Defendant for possession of the firearm once the officers entered the house and found the firearm on the couch right next to him, and his statement that he had a firearm and not to shoot him. See Illinois v. Gates, supra.

### C. Statement Made to Officer Walters

As Officer Walters entered the door of the apartment while executing the search warrant, the Defendant stood up, raised his hands, and said to Officer Walters, "Don't shoot. I've got a gun." Based on the evidence adduced at the hearing, the undersigned concludes that the statement was voluntarily made by the Defendant and did not come in response to any question asked by Walters or any other officer. As such, the protections of Miranda do not apply to this statement since the Defendant did not respond to express questioning or its functional equivalent initiated by the police. As such, his statement was a voluntarily made volunteered statement, and should not be suppressed. See Rhode Island v.Innis, 446 U.S. 291, 300-01 (1980).

### D. Other Statements Made by Defendant at the Scene of the Arrest

As to the statements made by the Defendant at the scene of his arrest, the undersigned concludes that these statements were lawfully obtained by Det. Martin after the Defendant was fully advised of his rights, stated he understood his rights, and waived his rights by agreeing to talk to Martin. The evidence shows that the Defendant was fully advised of each of his rights by Martin, and stated he understood them. The evidence further shows that the Defendant was not threatened in any way nor was he promised anything in order to make the statements in this case, and, in fact, appeared to be cooperative with Martin during the questioning. Although the Defendant was handcuffed at the time of the statements and a flash grenade had been used during the entry to the premises, the evidence showed that the Defendant was rational, calm, and coherently responded to questions by the officers. In addition, Det. Martin testified that the Defendant evidenced a cooperative attitude. Further, the Defendant obviously has had significant contact with the criminal justice system, as shown by his multiple felony convictions. In addition, the Defendant suggested to Det. Martin that

9

he be released "pending application of warrants" so that he, the Defendant, could cooperate with Martin in drug trafficking matters. The Defendant also was aware of the penalty in federal court for the offense of being a felon in possession of a firearm, a fact of which Martin, himself, was not aware. The undersigned concludes that this showed that the Defendant was not intimidated by his situation, and, in fact, perfectly understood it.

Therefore, based on the above, the undersigned concludes that, based on the totality of the circumstances of the Defendant's interrogation, the Defendant's statements were voluntarily made and his free will was not overborne by anything that took place during the interview. Miranda v. Arizona, 384 U.S. 436 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); United States v. House, 939 F.2d 659 (8th Cir. 1991) (waiver may be inferred from the fact that the Defendant responded to questioning after being advised of his rights). Therefore, the statements made by the Defendant at the scene of his arrest should not be suppressed.

**Conclusion**

Therefore, for all of the reasons stated above, the Defendant's motion to suppress evidence and motion to suppress statements should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion of Defendant to Suppress Physical Evidence [Doc. #26] and Motion to Suppress Statements [Doc. #27] be **denied.**

Further, the parties are advised that they have until August 5, 2008, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of July, 2008.